IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, EASTERN DIVISION

ANTHONY T. LEE, et al.,          )
                                 )
        Plaintiffs,              )
                                 )
UNITED STATES OF AMERICA,        )
                                 )
        Plaintiff-Intervenor     )
        and Amicus Curiae,       )
                                 )
NATIONAL EDUCATION               )        CIVIL ACTION NO.
ASSOCIATION, INC.,               )        3:70cv855-MHT
                                 )             (WO)
        Plaintiff-Intervenor,    )
                                 )
        v.                       )
                                 )
ROANOKE CITY BOARD OF            )
EDUCATION, et al.                )
                                 )
        Defendants.              )

OPINION ON LOCAL ISSUES

This longstanding school desegregation case began in

1963 when the plaintiffs, a class of black students,

sought relief from race discrimination in the operation

of a de jure segregated school system.  The defendants

are the Roanoke City Board of Education and its members

and superintendent, as well as the Alabama State Board of

Education and its members, the State Superintendent of Education, and the Governor of Alabama. The Roanoke City Board of Education and its members and superintendent have moved for declaration of unitary status and termination of this litigation. Based on the evidence presented, the court concludes that the motion should be granted.

## I. BACKGROUND

### A. Early Litigation

This case began in 1963 when several black students and their parents sued the Macon County Board of Education and its superintendent seeking relief from the continued operation of a racially segregated school system. On July 16, 1963, the United States was added as plaintiff-intervenor and amicus curiae in order that the public interest in the administration of justice would be represented. Lee v. Macon County Bd. of Educ., 267 F.Supp. 458, 460 (M.D. Ala. 1967) (three-judge court)

(per curiam), aff'd sub nom. Wallace v. United States, 389 U.S. 215 (1967) (mem.).   In a hearing before a single-judge court, the Macon County board was enjoined to make an immediate start to desegregate its schools "without discrimination based on race or color."  Lee v. Macon County Bd. of Educ., 221 F.Supp. 297, 300 (M.D. Ala. 1963) (Johnson, J.).

After actions by the State of Alabama to prevent implementation of this order, the Macon County plaintiffs filed an amended and supplemental complaint in February 1964 alleging that the Alabama State Board of Education, its members, the State Superintendent, and the Governor as president of the state board, had asserted general control and supervision over all public schools in the State in order to maintain a de jure segregated school system.   The court found that it was the policy of the State to promote and encourage a dual school system based on race, and the state officials were made defendants. Lee v. Macon County Bd. of Educ., 231 F.Supp. 743 (M.D.

3

Ala. 1964) (three-judge court) (per curiam).   In subsequent orders, the Lee court ordered the State Superintendent of Education to require school districts throughout the State, including Roanoke City, to desegregate their schools.   Lee v. Macon County Bd. of Educ., 292 F.Supp. 363 (M.D. Ala. 1968) (three-judge court) (per curiam); Lee, 267 F.Supp. 458.

On June 24, 1970, the three-judge court in Lee transferred the jurisdiction over 35 school boards involved in the Lee litigation, including the Roanoke City Board of Education, to a single district judge of the United States District Court for the Middle District of Alabama, where the school districts were located. On August 31, 1970, the school board was ordered to implement, effective for the 1970-71 school year, the proposed HEW desegregation plan with supplemental provisions approved by the court.   In February 1994, pursuant to a case involving inter-district transfer restrictions affecting the desegregation of schools in

4

several school systems, Roanoke City was ordered to implement fully student attendance and residency verification requirements as adopted by the school board in October 1993.

## B. School District Profile

The Roanoke City School System currently educates just under 1,500 students, 44 % of whom are African-American. The school operates a single attendance zone so that all students in each grade attend the same school. Knight-Enloe Elementary School (grades K-3) serves 453 students; Handley Middle School (grades 4-8) serves 612 students; and Handley High School (grades 9-12) serves 418 students. The racial enrollment at each school reflects the district-wide average. The district employs 104 faculty members, 18 % of whom are African-American.

## C.   The 1998 Consent Decree

On February 12, 1997, this court entered an order affecting eleven school systems, stating that the court was "of the opinion that the parties should now move toward 'unitary status' ... and for the termination of the litigation [for the school systems] in these cases." The court ordered the parties to confer to determine:

> "(a)   Whether, in any of the areas set forth in Green v. County School Board of New Kent, 391 U.S. 430, 88 S. Ct. 1689 (1968), the defendants have achieved unitary status and, if so, whether the court may relinquish jurisdiction as to these areas.  Freeman v. Pitts, 503 U.S. 467, 112 S. Ct. 1430 (1992)  [These areas are: student attendance patterns, faculty, staff, transportation, extracurricular activities and facilities (footnote omitted)].

> "(b) Whether there are Green or other areas as to which the plaintiff parties claim that the defendants have not eliminated the vestiges of prior de jure segregation.

> "(c) Whether the parties can amicably develop a procedure through which the school system can achieve unitary status."

6

This court thus set in motion a lengthy and deliberative process of reviewing each of the school systems, including the Roanoke City System.  The parties in all eleven cases agreed upon the format and scope of informal discovery.  The court designated a magistrate judge to oversee discovery and to mediate any disputes that arose during the course of negotiations.  The parties in this case conducted lengthy informal discovery to obtain information about the school system, including touring the district's facilities, and met with class and community members.  The plaintiff parties identified those issues for which satisfactory compliance had been attained as well as those areas for which the plaintiff parties identified as needing further attention.

On June 15, 1998, the court approved a consent decree detailing the areas of district operations in which the district was partially unitary and those in which further remedial action was necessary.  Courts may allow partial or incremental dismissal of a school desegregation case

before full compliance has been achieved in every area of school operations; jurisdiction is retained over the remaining parts of a desegregation case. <u>Freeman v. Pitts</u>, 503 U.S. 467, 490-91 (1992). The district was found to have achieved unitary status in the areas of student assignment to schools, facilities, and transportation. Injunctions or portions thereof pertaining to this area were dissolved, and these functions were appropriately returned to the control of the local governing body, the Roanoke City Board of Education. The areas identified for further action were: (1) faculty hiring and assignment; (2) student assignment and instruction within schools; (3) special education; (4) extracurricular activities; (5) student discipline; and (6) graduation rates. The parties agreed that, in order for the district to attain unitary status in these remaining areas, the board would undertake certain actions including developing policies and procedures in the identified areas to eliminate the remaining vestiges

8

of the dual system.  The consent decree sets forth in detail the areas to be addressed and the actions to be undertaken.   In  other  words,  the  consent  decree represented  "a  roadmap  to  the  end  of  judicial supervision" of the Roanoke City School System.  <u>NAACP, Jacksonville Branch v. Duval County Sch.</u>, 273 F.3d 960, 963 (11th Cir. 2001).  Many of the areas addressed fall under the <u>Green</u> factors, the areas of school operation which  are  traditionally  held  as  indicators  of  a desegregated (or not) school system.  <u>Green v. County Sch. Bd. of New Kent</u>, 391 U.S. 430 (1968) (the indicator areas  of  school  operation  are:  student  assignment, faculty  and  staff,  transportation,  facilities  and extracurricular activities).  The parties also addressed what have become known as quality-education issues that more closely relate to a student's day-to-day experiences within a school.  <u>Freeman</u>, 503 U.S. at 472.

The Roanoke City School District was required to file a comprehensive report with the court each year, and the

plaintiff parties had the opportunity to advise the school system of any concerns about compliance with the terms of the 1998 consent decree. Concerns raised by the plaintiff parties were noted in annual progress reports. These were discussed at the numerous status conferences held in this case. The parties sought the assistance of alternative dispute resolution to address continuing issues between the community and the district that affected resolution of the case. These issues were addressed through outside mediation that furthered dialogue between the community and the district. These circumstances notwithstanding, considerable progress was made in implementing the 1998 consent decree. This decree provided that the board could file for dismissal of the case three years after approval of the consent decree and after filing the third annual report.

### D.  State-Wide Issues

Over the course of years, as litigation affecting the individual school districts was dealt with by the courts as separate matters, the state defendants (that is, the Alabama State Board of Education and its members, the State Superintendent of Education, and the Governor of Alabama) did not participate in the Lee litigation.  The question arose as to whether the state defendants were even parties in the local off-shoots of the Lee cases. Previous rulings, particularly  Lee v. Macon County Bd. of Educ., 267 F.Supp. 458, held that the state defendants were responsible for the creation and maintenance of segregated public education in the State of Alabama.  The court found that state officials had "engaged in a wide range of activities to maintain segregated public education ... [which] controlled virtually every aspect of public education in the state." Lee, 267 F.Supp. at 478.  This court subsequently affirmed that despite cessation of participation by the state defendants when

11

the individual district cases were transferred, the state defendants continue as parties in not only the state-wide litigation, but in all the off-shoot cases. <u>Lee v. Lee County Bd. of Educ.</u>, 963 F.Supp. 1122, 1124, 1130 (M.D. Ala. 1997) (Thompson, J.).

The parties identified two issues remaining in the state-wide litigation, 'special education' and 'facilities.' The state-wide issues involving special education were resolved, and orders adopting the consent decree were entered on August 30, 2000, in the eleven <u>Lee</u> cases, including this one. <u>Lee v. Butler County Bd. of Educ.</u>, 183 F.Supp.2d 1359, 1363 (M.D. Ala. 2002) (Thompson, J.). As provided in the consent decree, the state defendants moved for declaration of unitary status and termination of the litigation. Following a fairness hearing on December 19, 2006, the court granted the motion and declared the Alabama State School Systems to be unitary in all respects on the state-wide issue of special education. <u>Lee v. Lee County Bd. of Educ.</u>, ___

12

F.Supp.2d _____, 2007 WL 690037 (M.D. Ala. 2007)
(Thompson, J.).  The state-wide facilities issues were
also resolved and orders adopting the consent decree were
entered in these cases on April 20, 2006.  Lee v. Lee
County Bd. of Educ., 2006 WL 1041994 (M.D. Ala. 2006)
(Thompson, J.).  The state-wide facilities consent decree
remains in operation.


### E. Motion for Declaration of Unitary Status

The district's progress in moving toward unitary
status was discussed at the several status conferences
held over the years.  The parties agreed that the
district should proceed with seeking termination of the
case.  On November 20, 2006, the Roanoke City Board of
Education and its members and superintendent filed a
motion to dismiss and for declaration of unitary status.
The school board's vote to proceed on the motion was
unanimous.  The court set the motion for a fairness
hearing and required the school board to give all

13

plaintiff class members appropriate notice of the motion as well as procedures for lodging objections.

After the court approved the notice form, the Roanoke City Board of Education published, in local newspapers over a three-week time period, notice of the proposed termination of this litigation and the date of the fairness hearing.  The notice also provided procedures for class members and interested persons to file comments and objections with the court regarding the proposed dismissal of this lawsuit.  Copies of all relevant documents--the unitary status motion, 1998 consent decree, and annual court reports--and forms for objections and comments were made available at the school district's central office and at the principal's office of each school from January 10, 2007 to February 28, 2007.  In addition, individualized notice was given to each parent or guardian of a student enrolled in the Roanoke City School District.

14

Nine objections were filed to dismissal of the case. On March 14, 2007, the court held a fairness hearing on the motion to dismiss and for declaration of unitary status.

The court concludes that the Roanoke City Board of Education complied with the directives of the court in providing adequate notice of the proposed dismissal to class members as well as to the community. Fed. R. Civ. P. 23(e).

## II.   DISCUSSION

### A.   Standards for Termination of a School Desegregation Case

It has long been recognized that the goal of a school desegregation case is promptly to convert a <u>de jure</u> segregated school system to a system without "white" schools or "black" schools, but just schools. <u>Green v. County School Bd. of New Kent</u>, 391 U.S. 430, 442 (1968). The success of this effort leads to the goal of ultimately returning control to the local school board

since "local autonomy of school districts is a vital national tradition." Freeman v. Pitts, 503 U.S. 467, 490 (1992) (quoting Dayton Bd. of Educ. v. Brinkman, 433 U.S. 406, 410 (1977)).  Returning schools to the control of local authorities "at the earliest practicable date is essential to restore their true accountability in our governmental system."  Id.

The ultimate inquiry concerning whether a school district operating under a school desegregation order to dismantle a de jure segregated school system should be declared unitary is whether the school district has complied in good faith with the desegregation decree and whether the vestiges of prior de jure segregation have been eliminated to the extent practicable.  NAACP, Jacksonville Branch v. Duval County Sch., 273 F.3d 960, 966 (11th Cir. 2001) (citing Missouri v. Jenkins, 515 U.S. 70, 88 (1995), and quoting Freeman, 503 U.S. at 492); see also Manning v. Sch. Bd. of Hillsborough

County, 244 F.3d 927, 942 (11th Cir. 2001); Lockett v. Bd. of Educ., 111 F.3d 839, 843 (11th Cir. 1997).

In addition to these articulated constitutional standards, here the Roanoke City Board of Education was required to comply with the contractual requirements of the 1998 consent decree setting forth specific steps the board was to take to attain unitary status.  NAACP, Jacksonville Branch, 273 F.3d 960.  The parties agreed that the board would analyze and review programs and practices in each of the areas in which further actions were required, that is, faculty hiring and assignment; student assignment and instruction within schools; special education; extracurricular activities; student discipline; and graduation rates.  The board was to formulate and adopt procedures and practices designed specifically to address each of these areas.  The board was thus required to take specific actions to address concerns the parties agreed were vestiges of the prior

dual system, and to ensure that the district was being
operated on a nondiscriminatory basis.

The legal standards for dismissal of a school
desegregation case were set forth in the 1998 consent
decree as (1) whether the district has fully and
satisfactorily complied with the court's decrees for a
reasonable period of time, (2) whether the vestiges of
past discrimination have been eliminated to the extent
practicable, and (3) whether the district has
demonstrated a good-faith commitment to the whole of the
court's decrees and to those provisions of the law and
the Constitution that were the predicate for judicial
intervention.    Jenkins, 515 U.S. at 87-89.    By
emphasizing that the good-faith component has two parts
(that is, that a school district must show not only past
good-faith compliance, but a good-faith commitment to the
future operation of the school system), the parties
looked both to past compliance efforts and to a
good-faith commitment to the future operation of the

18

school system through "specific policies, decisions, and courses of action that extend into the future." Dowell v. Bd. of Educ., 8 F.3d 1501, 1513 (10th Cir. 1993) (citations omitted). Regardless, "[t]he measure of a desegregation plan is its effectiveness." Davis v. Bd. of Sch. Comm'rs, 402 U.S. 33, 37 (1971).

### B. Terms of the 1998 Consent Decree and Compliance Efforts

1. Faculty and Administrator Recruitment, Hiring, Assignment and Promotion:  The Roanoke City Board of Education was required to make every effort to increase the number of black applicants in the pool from which it selects its teachers and administrators to fill administrative and faculty vacancies, and to ensure that teachers and administrators would be hired and promoted without regard to race, color, or national origin.  See Singleton v. Jackson Mun. Separate Sch. Dist., 419 F.2d 1211, 1218 (5th Cir. 1969); see also Bonner v. Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (the

Eleventh Circuit Court of Appeals adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981). As evidenced by the annual reports previously submitted, the district has expended considerable effort to recruit and employ minorities. A new recruitment plan was adopted and revisions were made to the application hiring process. The number of recruiting trips was increased and the posting and advertisement of vacancies were expanded. Mentoring and networking programs were developed for new teachers. Over the course of implementation of the consent decree, the percentage of faculty who are black increased from 16 % to 18 %, close to the state-wide average.

2. <u>Student Assignment Within Schools and Instruction</u>: The consent decree required the board to assign students to classes on a nondiscriminatory basis and to make every reasonable effort to ensure that all existing programs, including college-preparatory, honors, and advanced

20

courses, were conducted on a nondiscriminatory basis. The board was required to develop and adopt a range of procedures to inform students and parents of opportunities and encourage participation in the special programs offered by the district, particularly advanced academic courses and programs.

3. <u>Extracurricular Activities</u>:   The board was required to take all reasonable steps to ensure an equal opportunity for all students to participate in extracurricular activities.   The board undertook many steps in this area.   All sponsors and coaches of extracurricular activities were instructed to take affirmative steps to encourage student participation in extracurricular activities, and teachers were also encouraged to become sponsors.   The high school conducts an annual survey to monitor student interest and assist the administration in providing an array of activities that are of interest to the students.   Requirements and try-outs for clubs and athletic activities have been

widely publicized through announcements and an activity guide. Information about clubs and organizational membership is included in each school's student handbook, and extracurricular offerings are part of the orientation provided to students as they matriculate to middle school and high school.

4. Student Discipline: The Roanoke City School System took several actions to ensure that student discipline is administered on a nondiscriminatory basis. The district implemented and maintained a computer data base to allow the superintendent and building principals to monitor discipline referrals and actions. The superintendent serves as the discipline coordinator. A Code of Conduct handbook is provided to each student and parent or guardian. To ensure equal treatment for all students, cultural diversity training was provided, and all current staff members successfully completed Lee v. Macon awareness training. Additional activities and workshops were and continue to be provided.

5. <u>Student Dropout Intervention</u>: As part of its commitment to reduce the number of student dropouts, the district developed several programs to identify and work with students at risk of dropping out of school. During the 2005-06 school year, the district contracted with a counselor to work with students who had discipline problems, and these efforts resulted in a dramatic decline in the number of discipline referrals for students in the program. Dropout prevention services were provided for students, including after-school programs at the elementary and middle schools and a tutoring program to prepare students for the high school graduation exams. The district's dropout rate for the 2005-06 school year was 9.4 % which is four percent lower than the state-wide average.

6. <u>Special Education</u>: The state-wide issues involving special education were resolved by a consent decree entered on August 30, 2000. <u>Lee v. Butler County Bd. of Educ.</u>, 183 F.Supp.2d 1359, 1366 (M.D. Ala. 2002)

(Thompson, J.).  According to the terms of the state-wide decree, any claims in the area of special education would be raised with the state defendants.  Even if any such claim involving the Roanoke City School System were pending, it could not prevent a declaration of unitary status since the matter would have been addressed with the state defendants as part of the commitments made under the state-wide decree.  As required by this decree, state officials reviewed and monitored the district's special education programs.

7. <u>Monitoring</u>:  The Roanoke City Board of Education, as required by the 1998 consent decree, filed annual reports describing the district's efforts and accomplishments in implementing the provisions of the decree during the preceding school year. These reports were reviewed and monitored by the plaintiff parties. The plaintiff parties were given the opportunity to advise the board of any continued concerns about these efforts.  Progress reports were filed outlining the

24

positions of the parties for discussion at the annual status conferences.

8. <u>Future Action</u>:   The Roanoke City Board of Education has evidenced an understanding that the declaration of unitary status does not relieve it of its responsibility to its faculty, staff, students, and the community which it serves.  To this end, the Roanoke City School Board has demonstrated a commitment to continued adherence to nondiscriminatory policies and procedures through the development and adoption of a number of action plans and policy and procedure manuals.  It has contracted the services of facilitators and university officials to assist the district in the development and implementation of these programs.  On October 30, 2006, the board adopted a resolution stating its commitment to treating faculty and staff fairly and to ensuring that all students have equitable access to all educational programs and activities.

## C.   March 14, 2007, Fairness Hearing

After the Roanoke City Board of Education and its members and superintendent filed their motion for declaration of unitary status and termination of this litigation, the court required publication and notice of the proposed dismissal, scheduled a fairness hearing, and established procedures for filing comments and objections.

Nine objections were filed opposing termination of the case.   Several expressed general concerns about employment practices and failure to hire African-American faculty and staff, disparate student discipline, treatment of students, special education, instruction, and difficulties in communicating with teachers and administrators.   There were also specific allegations regarding the hiring of a bookkeeper in the central office, treatment and discipline of students, and the timing of the board's motion for termination of the litigation.

At the fairness hearing on March 14, 2007, four community members made statements objecting to dismissal of the case. Each had also submitted written objections. The first objector was a community activist who is a resident of the district and the parent of a child not enrolled in the Roanoke City School System. She was a member of the superintendent's advisory council as well as a participant in the mediated discussions between the community and the district. While acknowledging improvement under the 1998 decree, she wanted assurance that such improvement would continue and expressed concern about progress continuing without the court order. She expressed particular concern about disparities in student discipline, dropout rates, expulsions, and advanced diplomas, as well as in the timing of the motion for unitary status and dismissal.

The second objector, the parent of a student in the system, is an elected Randolph County Commissioner. She expressed concerns about employment, particularly the

27

failure to hire either of two black applicants for a bookkeeper position in the central office. She did not know if either had filed a complaint with the Equal Employment Opportunity Commission. She said that the current superintendent had done more than any other superintendent, but wanted legally binding assurances that progress would continue after he left.

The third objector is the NAACP branch president. As stated in his written objection, he expressed concern about hiring, student discipline, and the timing of the motion for unitary status. He stated that some black teachers had been forced out of the system, but knew of no one who had come forward with such a complaint. He expressed his appreciation for the progress made by the superintendent, but wanted continued court protection.

The fourth objector, the grandparent of a student, graduated from Roanoke City schools prior to desegregation and spoke about the scars from the discrimination she experienced as a student and the need

to protect students from such experiences.  She is a community activist, journalist, and the previous president of the local chapter of the NAACP.  She does not believe that the district has demonstrated compliance for a reasonable period of time.  She cited an incident involving the discipline of a special-education student and her difficulties in dealing with the district on behalf of the student.  She also believes there is internal racism in the system and that the academic excellence of African-American students is not recognized.

Two witnesses testified on behalf of the district and were cross-examined by counsel for private plaintiffs and the United States: the superintendent and the chairman of the school board.  Their testimony, particularly that of the superintendent, addressed the issues raised in the objections.  Additionally, four of the five school board members attended the hearing.  Two of the members, including the chairperson, are African-American.

29

Superintendent Chuck Marcum has been superintendent for approximately three years and has worked in the district for nearly 20 years.  His testimony addressed the issues raised in the objections.  He described in detail efforts by the district to increase the pool of African-American candidates as required by the decree. These included increased recruiting trips, often accompanied by African-American community leaders, to colleges and universities in the area, including numerous historically black colleges and universities.  Of 135 contacts made during last year's recruiting trips, 66 were African-American.  The district offers a future teachers club at the high school and a student-provided tutoring program to encourage students to consider teaching as a career.  The district improved teacher retention with implementation of a mentoring program to provide support for new teachers.

The superintendent addressed an objector's allegation that two African-American applicants were wrongly passed

30

over for a bookkeeper position in the central office. He testified that the vacancy was in fact for a chief financial officer, a new position mandated by the state with minimum requirements set by statue. One of the African-American applicants did not have the minimum three years of experience, and the person hired demonstrated the most knowledge for the position.

Responding to general allegations by objectors about student instruction, the superintendent described efforts by the district to improve math instruction at the middle and high schools. The district ensured that each seventh grader had access to a computer and provided laptops to 43 students who qualify for free and reduced lunch this school year. The district has improved reading instruction, and 96 % of last year's kindergarten students were reading at least at grade level. The district works with a local church to provide after-school tutoring. The superintendent also described the district's successful efforts to increase minority

31

student participation in advanced classes.  Students are encouraged to seek advanced diplomas, and the district has expanded its notice about programs to students and parents through orientations and open houses prior to students matriculating to the middle school and high school.

While a small system, the district offers an array of extracurricular activities.  Participation is encouraged, and information about activities is provided in student orientations and open houses.  The superintendent disputed allegations that African-American students are discouraged from participation in academic clubs or denied admission to the National Honor Society (NHS). NHS criteria are set by the national organization and the superintendent did not know of any students who met this criteria and were denied admission to the NHS.  In fact, he testified that the admission of African-American students to the district chapter of NHS is in fact increasing.  Of the students admitted this school year,

26 % are African-American.   The district's competitive academic team has six members, two of whom are African-American.   African-American  students are also active in the high school math club.

The superintendent also described successful efforts to address the objectors' concerns regarding discipline. The board hired an outside consultant who worked with repeat offenders and with the district's Building Based Student Support Team to identify discipline issues early and provide preventive services.   The middle school principal instituted a positive incentive program to promote good behavior.   These efforts resulted in a significant reduction in discipline referrals.

The superintendent's testimony also addressed more specific allegations in the written objections and statements made by the objectors at the hearing.   The superintendent acknowledged the objectors' commitment to the district but disputed some of the allegations made. He also noted that some of the incidents described by the

33

objectors occurred several years ago, prior to the beginning of his tenure in early 2004.

The incident involving discipline of a special-education student was difficult for the superintendent to address, he said, because the community activist who complained about the incident was not the parent or guardian of the student and this prevented school officials from discussing the matter with her.  He testified, however, that he did discuss general issues related to this incident with the objector and other community activists.

Another objector complained about school officials' refusal to discuss disciplinary action, including corporal punishment, meted out to her grandson.  The superintendent testified that he investigated this allegation and discovered that while the student lived his the grandmother during the week while his father worked out of town, she was not the legal guardian and the father was in contact with the school.  Nonetheless,

34

the superintendent expressed concern about the way the grandmother was treated and is working to improve communication between the grandmother and the school to ensure that she feels welcome since she has physical custody during the school week.

Another objection complained of an article in the local newspaper recognizing an all-white girls club. The superintendent stated that the club is no longer affiliated with the school and is not allowed to use school facilities or communicate activities through the school. While it had been a longstanding club at the high school, the superintendent removed the club because it failed to follow school policies.

The superintendent stated that many of the objectors are community activists and leaders who have worked with the district and with him to improve education in the school system. He stated that there has been no reluctance in their bringing concerns to him, and he does not see anything that would inhibit them from continuing

35

to raise such issues with him if unitary status were granted.  The superintendent testified that he believes he has done everything he was required to do, and that unitary status will not end these efforts since he and the board have put mechanisms in place to continue to address issues of concern in the district, particularly through the continuation of the superintendent's advisory council.

The second witness to testify was Calvin W. Trammell, chairman of the Roanoke City School Board.  He has been a board member for seven and a half years and has nearly three years remaining in his second term.  He testified that he understands the concern of citizens in his community and that a good relationship with the community is important.  Trammell attended various community meetings to discuss issues, including unitary status. While earlier boards would sometimes vote along racial lines, Trammell testified that the current board is more unified and works together to address issues.

36

### III.   CONCLUSION

On the basis of the record evidence, witness testimony, and averment of counsel, the court finds that the Roanoke City Board of Education and its members and superintendent have met the standards entitling the school district to a declaration of unitary status and termination of this litigation.

The Roanoke City Board of Education has fully and satisfactorily complied with the orders of this court. The vestiges of the prior <u>de jure</u> segregated school system have been eliminated to the extent practicable. The court also finds that the board and its members and superintendent have demonstrated a good-faith commitment to the whole of the court's decrees and to those provisions of the law and the Constitution that were the predicate for judicial intervention in this school system in the first instance, through their compliance with the court's orders over the years, through their good-faith implementation of their contractual obligations under the

37

1998 consent decree, and through their adoption of
specific policies and actions that extend into the future
demonstrating their commitment to the operation of a
school system in compliance with the Constitution.

The plaintiff parties have succeeded in the task they
began decades ago to seek the end of the seemingly
immovable de jure system of school segregation in Roanoke
City.   This lawsuit sought to bring the district into
compliance with the constitutional requirement of equal
protection under the law, and the court states today that
they have succeeded.   See NAACP, Jacksonville Branch v.
Duval County Sch., 273 F.3d 960, 976 (11th Cir. 2001).
By its actions today, the court recognizes and
congratulates the sustained efforts of the parties.   In
so doing, the court notes, as the Eleventh Circuit stated
in Duval County School, that "[t]he Board, and the people
of [Roanoke City] who, in the end, govern their school
system, must be aware that the door through which they
leave the courthouse is not locked behind them. They will

38

undoubtedly find that this is so if they fail to maintain the unitary system [the court] conclude[s] exists today." Id. at 976-77.

Therefore, with the judgment the court will enter today, control over the Roanoke City School System is properly returned to the Roanoke City Board of Education and its members and superintendent. The motion to dismiss and for declaration of unitary status filed by the board and its members and superintendent will be granted, all outstanding orders and injunctions will be dissolved, and this litigation dismissed as to the board and its members and superintendent. However, the state defendants are not dismissed, and the orders dealing with the state-wide 'facilities' issues are not dissolved.

DONE, this the 23rd day of April, 2007.

        /s/ Myron H. Thompson
    UNITED STATES DISTRICT JUDGE